In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 21-2406

TONY LOVE,

*Petitioner-Appellant,*

*v.*

FRANK VANIHEL, Warden

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:20-cv-00281 — **James R. Sweeney, II**, *Judge.*

———————————

ARGUED APRIL 19, 2023 — DECIDED JULY 7, 2023

———————————

Before HAMILTON, BRENNAN, and KIRSCH, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Tony Love assaulted an Indiana correctional officer while serving a 55-year prison term for murder. Indiana pursued criminal charges against Love, resulting in convictions for felony battery. The Indiana Department of Correction also instituted its own prison disciplinary proceedings, found Love guilty of violating prison rules, and imposed sanctions including revocation of 5,700 days of his accrued good time credit. As it stands, the Department's

decision extended Love's release date from prison by more than 15 years. Love unsuccessfully challenged those sanctions through prison appeals, and the district court denied his 28 U.S.C. § 2254 petition. Because Love procedurally defaulted his constitutional claims and forfeited the same by failing to present them in the district court, we affirm that denial.

**I**

Love is serving nearly 60 years of consecutive prison sentences for murder and felony battery. Under Indiana law, individuals who committed an offense before July 1, 2014, can earn up to one day of good time credit for each day imprisoned. IND. CODE § 35-50-6-3(a)–(b). The amount of credit an inmate is eligible to earn depends on which "credit time class" he is assigned, and the Department is authorized to promote or demote inmates to different credit time classes. *See* IND. CODE § 35-50-6-4. The Department is also authorized to revoke and restore earned good time credit. IND. CODE § 35-50-6-5(a)(1), (c). Love entered state custody in 2002, and between then and 2018 he earned thousands of days of good time credit.

The Department revoked all of Love's good time credit after conducting a hearing and finding him guilty of battering a correctional officer. The fight took place in August 2018 when another inmate, Antwan Webb, started an argument with correctional officer Sgt. Hubbard. Prison surveillance cameras recorded video of the brawl. Hubbard pepper-sprayed Webb to restrain him, but the encounter turned violent. Nearby inmates, including Love, Sanchez Williams, and Matthew Schrock, Jr., attacked Hubbard and other responding officers. Amidst the fighting, Love struck Hubbard in the head several times with a closed fist, causing severe injuries. Schrock also

stole Hubbard's pepper spray during the fight and used it against correctional officers.

Two Indiana government entities punished Love for his conduct. State prosecutors charged him with three counts of felony battery, culminating in convictions in 2019, which resulted in an additional, consecutive[1] prison term of four years and six months. Exercising its authority under Indiana law, the Department also instituted internal disciplinary proceedings, which form the basis of this appeal. The Disciplinary Code for Adult Offenders governs how and when inmates are sanctioned for misconduct. Per the Code, an inmate can lose a maximum of one year of good time credit for a single offense: "[o]ffenders found guilty of … egregious offenses … shall be subject to a loss of up to 12 months of Earned Credit Time with justification from the Hearing Officer." But a different policy was in effect at the time of Love's offense. The Department of Correction Commissioner issued Executive Directive #17-09 in February 2017, which partially superseded the Disciplinary Code and imposed harsher sanctions for certain conduct. In relevant part, the Directive states:

> Any adult offender found guilty of a violation of offense code A102, "Assault/Battery[]" … and the offensive acts committed by the offender involved a Battery upon any Department staff member … and resulted in bodily injury or

---

[1] Indiana law mandates that sentences imposed for criminal acts committed in prison be served consecutively to any pre-existing criminal sentences. IND. CODE § 35-50-1-2(e) ("If, after being arrested for (1) crime, a person commits another crime: (1) before the date the person is discharged from … a term of imprisonment imposed for the first crime … the terms of imprisonment for the crimes shall be served consecutively … .").

> serious bodily injury being caused to the staff member … shall receive, in addition to the other sanctions for the offense listed in … "The Disciplinary Code for Adult Offenders," a loss of the entire balance of the offender's accumulated earned credit time.

The parties agree Directive #17-09 was in effect from February 2017 to March 2020. As such, it applied at the time of the fight and during Love's prison disciplinary proceedings.

After a formal disciplinary hearing in 2018, a Department hearing officer found Love guilty of an A102 violation for battering Hubbard. Prior to Directive #17-09, that determination would have made Love eligible to lose up to one year of good time credit. But, as indicated, Directive #17-09 enhanced the sanctions for A102 violations. The hearing officer applied the Directive and vacated 5,700 days of good time credit in addition to imposing other sanctions.[2]

In 2020, though, an appeal review officer vacated the 2018 sanctions and designated the case for rehearing. A hearing officer again found Love guilty of an A102 violation and imposed largely identical sanctions, including revocation of 5,700 days of Love's good time credit. Love's appeal of that decision was denied. With the administrative procedures available to Love exhausted, he filed a pro se § 2254 petition. *See McAtee v. Cowan*, 250 F.3d 506, 508 (7th Cir. 2001) (per curiam) ("Indiana inmates may immediately petition for a writ

---

[2] The hearing officer also demoted Love two good time credit classes, issued a written reprimand, limited his phone and commissary access for 45 days, ordered monetary restitution, and imposed disciplinary restrictive housing for one year.

of habeas corpus in federal court after exhausting their internal administrative remedies.") (citation omitted). The district court denied relief, finding that the grounds Love advanced either lacked merit or implicated questions of state law not cognizable on federal habeas.

Love appealed[3] and, after reviewing the briefs and appellate record, we appointed counsel and asked them to "address whether the State may, consistent with the due process clause of the Fourteenth Amendment, deprive petitioner of so much earned time by using the due process requirements of *Wolff v. McDonnell*, 418 U.S. 539 (1974), and *Superintendent v. Hill*, 472 U.S. 445 (1985)." After re-briefing, Love offers two primary arguments. His first concerns the mandatory nature of Executive Directive #17-09. Per the Directive, the Department must revoke all accrued good time credit from inmates found guilty of qualifying offenses. There is no additional sanctions hearing, and the inmate is not provided an opportunity to argue why revocation of less time is appropriate. Love contends this procedure is constitutionally inadequate. He argues the Department cannot, consistent with due process, predetermine how it will use its discretionary power over sanctions without first considering arguments in mitigation.

Love also argues that Executive Directive #17-09 is facially arbitrary. He contends it ties punishment to the amount of good time credit an inmate has rather than the severity of

---

[3] Love can appeal without a certificate of appealability because Indiana law does not allow state court review of prison discipline decisions. *See Walker v. O'Brien*, 216 F.3d 626, 637–38 (7th Cir. 2000) (concluding there is "no statutory authorization for imposing the [certificate of appeal] requirement on appeals in which the complained of detention does not arise from process issued by a state court").

misconduct. He also asserts the Department arbitrarily applies the Directive. On that point, Love offers two examples where other inmates presumably should have been punished in accordance with the Directive but were allegedly shown leniency instead. For Love, the selective application of Directive #17-09 means the Department's "decision to revoke all of [his] good time credits was so arbitrary and irrational that it was unconstitutional."

The State responds that Love's two constitutional arguments are not properly before this court. According to the State, Love procedurally defaulted his constitutional claims by failing to raise them in the prison administrative proceedings and forfeited them on appeal by failing to bring them in the district court. The State also contends that Love's arguments fail on their merits because the Constitution does not require the procedure Love requests and the revocation of Love's good time credit was not arbitrary.

We review de novo the district court's denial of Love's § 2254 petition. *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014) (citing *Ford v. Wilson*, 747 F.3d 944, 949 (7th Cir. 2014)). We do not defer to the Department's administrative adjudication of Love's claims. Deference is owed when a state court adjudicates a claim on its merits, § 2254(d), but "a prison disciplinary board is not a 'court.'" *Scruggs v. Jordan*, 485 F.3d 934, 938 (7th Cir. 2007) (quoting *Pannell v. McBride*, 306 F.3d 499, 502 (7th Cir. 2002) (per curiam)).

## II

We begin with procedural default and forfeiture. Love's petition fails unless he overcomes those procedural hurdles. To do so, he must show that the Department's Directive

violated his constitutional rights. If the Directive is constitutional, then no constitutional error infected Love's sanctions, and Love can neither demonstrate prejudice to overcome procedural default nor show an effect on substantial rights warranting forgiveness of forfeiture. So, the second half of our analysis examines Love's arguments that the Department, through its use of the Directive, violated his constitutional rights.

**A**

We start with procedural default. "State prisoners challenging the deprivation of good-time credits by way of a habeas corpus petition must exhaust adequate and available state remedies before proceeding to federal court." *McAtee*, 250 F.3d at 508 (citation omitted); *see also* 28 U.S.C. § 2254(b)(1)(A), (c). To properly exhaust a claim and "avoid procedural default, a habeas petitioner must 'fairly present' a claim to each level of the state courts." *McDowell v. Lemke*, 737 F.3d 476, 482 (7th Cir. 2013) (quoting *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006)); *see also Moffat v. Broyles*, 288 F.3d 978, 982 (7th Cir. 2002). Indiana "has no judicial procedure for reviewing prison disciplinary hearings," *McAtee*, 250 F.3d at 508, "so the exhaustion requirement in 28 U.S.C. § 2254(b) is satisfied by pursuing all administrative remedies," *Moffat*, 288 F.3d at 981, and presenting legal contentions "to each administrative level." *Id.* at 982. Procedural default here thus turns on which claims Love raised when appealing within the Department.

After the Department's 2020 disciplinary decision, Love internally appealed his sanctions as far as he could. At those proceedings, Love claimed the hearing officer improperly "copied the sanctions" from his original hearing and thereby

judged him "guilty before the hearing" in violation of due process. Love also claimed the hearing officer revoked more good time credit than the Disciplinary Code for Adult Offenders allowed. The State views those claims as distinct from the constitutional claims Love now asserts and urges us to resolve this appeal on default. Love offers little resistance on the question of whether he defaulted his constitutional claims, focusing instead on why we should excuse default.

We agree with the State that Love procedurally defaulted the two constitutional claims he brings on appeal. While we do not require a prisoner to "articulate legal arguments with the precision of a lawyer," during state proceedings, the claims Love raised in his administrative appeals bear no resemblance to the constitutional claims he now brings. *Moffat*, 288 F.3d at 982. This means we will only review Love's constitutional claims if he establishes an excuse for the procedural default.

A petitioner seeking review of defaulted claims has two options. He can show "cause and prejudice for the default" or he can demonstrate that failure to consider the defaulted claims will result in a "miscarriage of justice." *Promotor v. Pollard*, 628 F.3d 878, 885 (7th Cir. 2010) (citation omitted). Love relies exclusively on the first option, arguing the Department caused any procedural default and that he has suffered prejudice. We examine each prong of the cause and prejudice inquiry.

*Cause*. "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded" compliance with the procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). This normally means petitioner must "show[]

that the factual or legal basis for a claim was not reasonably available," or "that 'some interference by officials[]' … made compliance impracticable." *Id.* (quoting *Brown v. Allen*, 344 U.S. 443, 486 (1953)); *see also Garcia v. Cromwell*, 28 F.4th 764, 775 (7th Cir. 2022) (quoting *Thompkins v. Pfister*, 698 F.3d 976, 987 (7th Cir. 2012)) ("Cause requires a showing of 'some type of external impediment' that prevented [petitioner] from presenting his claims.").

Love argues the Department caused his procedural default by misleading him as to which policies applied to his disciplinary rehearing and what potential penalties he faced. Before Love's rehearing, the Department provided him with a Notice of Disciplinary Hearing Screening Report, which should have apprised Love of the applicable policies. But that document does not mention Executive Directive #17-09. Instead, the Notice states "a finding of guilt may result in the imposition of sanctions in accordance with the sanctioning guidelines in Policy 02-04-101, 'The Disciplinary Code for Adult Offenders.'" That Executive Directive #17-09 is not mentioned on the Notice poses a problem, as there are significant differences between the Disciplinary Code for Adult Offenders and the Executive Directive. Recall that for an A102 violation, the Disciplinary Code caps loss of good time credit at one year, but the Directive requires revoking all credit. So, the Notice of Disciplinary Hearing contained incomplete information about which policies governed Love's hearing and what sanctions the Department would impose if it found him guilty.

This issue was not corrected during Love's administrative appeals, either. Though Love argued to prison officials that his sanctions exceeded those authorized in the Disciplinary

Code, neither appeals decision informed Love that he was sanctioned under the Directive. When denying the first appeal, the facility head wrote, "I find no procedural errors and the sanctions are well within the allowed guidelines." The final reviewing authority's decision was similar: "The procedure and due process of this case appear to be true and accurate … The sanctions are within the guidelines of the Disciplinary Code for Adult Offenders."

Love argues this misinformation caused his procedural default. He contends he could not have challenged the directive because the Department did not provide it to him—rather, he was told a different policy would apply. We agree. The Department's incomplete information about which policy applied constitutes cause for Love failing to bring his constitutional claims in the prison proceedings. Without knowledge that the Department was applying Executive Directive #17-09 to his case, Love could not feasibly have brought the constitutional claims he now offers.

Love's claims on appeal bear this out. He contends his sanctions are unconstitutional because the Department used its discretion to predetermine what his punishment would be if he was found guilty. Without knowing that the Directive mandated loss of all good time credit, Love would not have reason to bring this claim. The Department told Love that the Disciplinary Code controlled, and the Code did not require loss of all good time credit. Rather, it left that decision in the hearing officer's discretion and set an upper limit of one year. Love also claims his sanctions are arbitrary because the Directive ties punishment to available good time credit and because the Department applied the Directive to him but not to similarly situated inmates. This arbitrariness claim, too,

necessarily requires knowledge of the Directive. The Department's misinformation is therefore "some interference" making presentment of Love's constitutional claims in administrative proceedings impracticable. *Murray*, 477 U.S. at 488.

*Prejudice*. The parties disagree on what it means to show prejudice for procedural default. The State quotes *Johnson v. Foster*, 786 F.3d 501, 505 (7th Cir. 2015): "[P]rejudice exists where the error 'so infected the entire trial that the resulting conviction violates due process.'" Love offers a slightly different definition of prejudice, quoting *Richardson v. Briley*, 401 F.3d 794, 801 (7th Cir. 2005): "'[T]here is a reasonable probability that the result … would have been different' but for the constitutional error."[4]

The precise definition of prejudice ultimately is not dispositive here. We conclude that the Directive is constitutional, so Love is unable to demonstrate prejudice under either his definition or the State's. Still, we think the Supreme Court's recent definition of prejudice in *Shinn v. Ramirez*, a case addressing the cause and prejudice excuse for procedural default, is best. 142 S. Ct. 1718, 1733 (2022). In *Shinn*, the Court explained, "to establish prejudice, the prisoner must show not merely a substantial federal claim, such that the errors at trial created a *possibility* of prejudice, but rather that the constitutional violation worked to his *actual* and substantial

---

[4] The "reasonable probability that … the result of the proceeding would have been different" formulation applies to other constitutional claims, such as the prejudice prong of a *Strickland* analysis, *Strickland v. Washington*, 466 U.S. 668, 694 (1984), and the materiality prong of a *Brady* analysis, *United States v. Bagley*, 473 U.S. 667, 682 (1985). But the parties identify no case where the Supreme Court defined prejudice in exactly that manner for procedural default.

disadvantage. *Id.* (cleaned up). Though we need not resolve this issue conclusively, we rely on the *Shinn* definition.

Trying to show prejudice, Love argues there is a reasonable probability that his sanctions would have been different if he had been afforded due process. His attempt to show prejudice falls short, though, for two reasons. First, the Directive, which required that Love lose all good time credit once found guilty, is constitutional. As we will explain in detail, the Constitution does not require the procedure Love suggests, and the Department's sanction decision was not arbitrary. So, even if the Department caused Love to procedurally default his constitutional claims, he suffered no prejudice. The Department's imposition of sanctions did not violate Love's constitutional rights at all, let alone in a way that worked to his actual and substantial disadvantage.

Second, Love does not connect his constitutional arguments to the prejudice inquiry. He argues the Department should have afforded him a chance to present mitigating arguments, but he fails to identify what arguments he would have presented. Love also argues that his sanctions are unconstitutionally arbitrary, but he makes no effort to connect that claim to the question of prejudice. Given this, even if the Directive were unconstitutional, we seriously question Love's ability to show prejudice. We return to the Directive's constitutionality after examining forfeiture.

**B**

Procedural default concerns which claims Love raised during his prison administrative proceedings. Forfeiture centers on which arguments Love raised in the district court. Arguments inadvertently not raised in the district court are

forfeited[5] and, in the civil context, ordinarily unreviewable on appeal, because we review forfeited claims only in exceptional cases. *See Henry v. Hulett*, 969 F.3d 769, 785–86 (7th Cir. 2020) (en banc). The State argues Love forfeited his constitutional arguments by failing to present them in his original habeas petition. Love offers three responses.

First, he asserts he preserved his constitutional challenges to the Department's sanctions, especially when his pro se district court filings are liberally construed. Even liberally construing Love's district court filings, though, he never raised an argument resembling those he now offers. The closest Love came in his petition was arguing his sanctions were "excessive." That assertion, made in reference to the Department's

---

[5] Love's arguments may well be waived instead of forfeited. *See Santiago v. Streeval*, 36 F.4th 700, 710 (7th Cir. 2022) ("An argument not raised in the habeas petition or in briefing before the district court is waived on appeal.") (citation omitted); *see also Ben-Yisrayl v. Neal*, 857 F.3d 745, 747 (7th Cir. 2017). Still, given this case's unique facts, I think it best to consider Love's arguments forfeited. Circuit precedent tends to apply forfeiture rather than waiver when failure to raise an argument is inadvertent, *see United States v. Flores*, 929 F.3d 443, 447–48 (7th Cir. 2019); *Henry*, 969 F.3d at 786. Love was pro se in the district court and unaware of the Directive until the State's response to his petition.

The line between waiver and forfeiture is not always clear, especially in the civil context. *Compare Frazier v. Varga*, 843 F.3d 258, 262 (7th Cir. 2016) ("Regardless of whether a habeas claim was fairly presented or defaulted in the state courts, if an argument was not presented to the federal district court, it is forfeited in this court.") (citation omitted), *with McGhee v. Watson*, 900 F.3d 849, 853 (7th Cir. 2018) (applying waiver where petitioner failed to present claims in the district court). But even if the choice between waiver and forfeiture is a close call, it does not change the outcome: Love's arguments fail under the more lenient forfeiture rules, so he is not entitled to relief under either standard.

policies and not the Constitution, did not preserve Love's con-
stitutional arguments.

Second, Love argues he could not have raised his due pro-
cess challenges in his habeas petition because the state's "mis-
direction" made him unaware of the Directive. This may
explain why Love failed to raise his constitutional arguments
in his original petition, but it does not permit him to evade
forfeiture. After Love filed his original habeas petition, the
State identified Executive Directive #17-09 as the basis for
Love's sanctions. At that time, Love should have raised his
constitutional arguments concerning the Directive. He should
have alerted the district court—through his reply brief, a mo-
tion to amend his petition, or otherwise—that he was only just
learning of the Directive and wished to offer additional argu-
ments concerning its validity. *See Federated Mut. Ins. Co. v.
Coyle Mech. Supply, Inc.*, 983 F.3d 307, 315 (7th Cir. 2020). But
Love failed to raise his constitutional arguments in the district
court, even after he became aware of the Directive. He there-
fore forfeited those arguments.

Third, even if Love did forfeit his constitutional argu-
ments, he contends that forfeiture should be excused. For him,
"it would be unjust to hold that [he] forfeited his due process
challenges by not reacting to the state's revelation" in the
short time between the State's response to his petition and the
deadline for his reply. We rarely review forfeited claims, and
then only for plain error: "[I]n civil cases, 'we typically will
not entertain an argument raised for the first time on appeal,
even for the limited purpose of ascertaining whether a plain
error occurred.'" *Henry*, 969 F.3d at 786 (quoting *CNH Indus.
Am. LLC v. Jones Lang LaSalle Ams. Inc.*, 882 F.3d 692, 705 (7th
Cir. 2018)). To reach plain error review, Love must

"demonstrate that: '(1) exceptional circumstances exist; (2) substantial rights are affected; and (3) a miscarriage of justice will occur if plain error review is not applied.'" *Id.* (quoting *Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626, 636 (7th Cir. 2018)). We have discretion to decide which "circumstances fit these criteria." *Id.* (citation omitted)

At this point, we streamline our discussion of procedural default and forfeiture into the single inquiry of whether the Executive Directive is constitutional. If it is, then Love cannot show prejudice to overcome procedural default because he cannot demonstrate that a constitutional violation worked to his actual and substantial disadvantage. *Shinn*, 142 S. Ct. at 1733. Likewise, in that case Love cannot justify setting aside forfeiture and reaching plain error review. If the Department acted lawfully, then Love's case is not exceptional, substantial rights are not affected, and no miscarriage of justice will occur if plain error review is not applied. *Henry*, 969 F.3d at 786.

The bottom line is that Love identifies no constitutional flaw with the Directive. It does not deprive him of procedural due process, and it is not arbitrary on its face or as applied. So, we hold that Love cannot overcome procedural default or forfeiture and is not entitled to habeas relief.

With that, we turn to Love's constitutional arguments concerning the Directive.

### III

### A

Love contends he was denied due process by the Department "predetermining" that it would revoke all his good time credit without giving him a hearing to argue for a lesser sanction. In so arguing, Love is not asserting that determinate

punishments are generally unconstitutional—nor would that assertion be correct. The Supreme Court has made clear that "[d]eterminate sentences were found in this country's penal codes from its inception," *Chapman v. United States*, 500 U.S. 453, 467 (1991), and "sentencing scheme[s] providing for 'individualized sentences rest[] not on constitutional commands, but on public policy enacted into statutes.'" *Id.* (quoting *Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978)). Love recognizes this. He concedes the Indiana Legislature could have decided to set a specific credit revocation for prison rules infractions. Love also does not claim that the Department violated his due process rights when determining his guilt on the A102 violation. This case is about an additional hearing for determining his sanctions.

Namely, Love targets the intersection between the Department's discretion over sanctions and its choice to mandate a particular punishment for certain offenses. As indicated, Indiana law grants to the Department the authority to deprive inmates of good time credit for violating Department rules. IND. CODE § 35-50-6-5(a)(1). It gives the Department discretion over whether and how much loss of good time credit is an appropriate sanction for rule violations. *Id.* The Department exercised that discretionary power when it decided—through Executive Directive #17-09—that certain violations would be punished with an automatic determinate sanction. It is that exercise of discretion that Love contends is unconstitutional.

Contrary to Love's position, neither the Supreme Court nor our court have held that due process requires prison administrators to hear mitigating arguments before determining whether to revoke good time credit, and if so, how much to revoke. In *Wolff*, 418 U.S. at 557, 560, the Court recognized that

inmates have a liberty interest in their good time credit but held that procedural due process operates differently in the prison context. Given those considerations, the Court in *Wolff* identified a discrete set of procedural protections that must apply when prison discipline proceedings result in the loss of good time credit. *Id.* at 563–67. The Court has summarized the *Wolff* procedural requirements as requiring, in addition to a hearing:

> (1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action.

*Hill*, 472 U.S. at 454 (citing *Wolff*, 418 U.S. at 563–67). The Court revisited the question of good time credit revocation in *Hill*, where it added the additional procedural requirement that "some evidence" support a disciplinary board's decision to revoke good time credit. *Id.* at 455.

Since *Wolff* and *Hill*, the Supreme Court has not required prison administrators to hear mitigating arguments before determining that revocation of good time credit is an appropriate sanction or deciding how much good time credit to revoke. To be sure, the Supreme Court has held that—when a court has discretion over whether to revoke parole or probation—parolees and probationers have a right to present mitigating arguments before a decision. *Black v. Romano*, 471 U.S. 606, 614 (1985) (explaining that "where the factfinder has discretion to continue probation," the probationer is assured "an opportunity to present mitigating evidence and to argue that

alternatives to imprisonment are appropriate"); *Morrissey v. Brewer*, 408 U.S. 471, 488 (1972) (holding that parolees "must have an opportunity to be heard and to show … that circumstances in mitigation suggest that the violation does not warrant revocation"). But the Court has ruled that parole and probation revocation hearings demand more process than prison discipline proceedings and that the safeguards required in those settings do not inherently apply in prisons. *Wolff*, 418 U.S. at 561 (explaining that deprivation of good time credit is "qualitatively and quantitatively different from the revocation of parole or probation"); *id.* at 560 ("[I]t is immediately apparent that one cannot automatically apply procedural rules designed for free citizens in an open society, or for parolees or probationers under only limited restraints, to the very different situation presented by a disciplinary proceeding in a state prison.").

Love does not argue that his prison discipline procedures lacked the safeguards mandated in *Wolff* and *Hill*. So, he can prevail only if we require prison administrators to afford inmates a new and additional procedure—the right to present mitigating arguments prior to a discretionary decision on good time credit revocation. Scarcely ever has this court added to the *Wolff* and *Hill* protections, and a recent decision probably forecloses doing so again. *Compare Chavis v. Rowe*, 643 F.2d 1281, 1286 (7th Cir. 1981) (requiring prison disciplinary officials to disclose exculpatory materials), *and Whitlock v. Johnson*, 153 F.3d 380, 388 (7th Cir. 1998) (holding that a blanket rule preventing virtually all live witness testimony violated due process), *with Crawford v. Littlejohn*, 963 F.3d 681, 683 (7th Cir. 2020) (holding procedural due process does not prohibit prison officials from revoking good time credit in reliance on uncorroborated hearsay evidence and explaining

"[w]e have been told not to add procedures to *Wolff*'s list.");
*see also Baxter v. Palmigiano,* 425 U.S. 308, 322–24 (1976) (reaf-
firming that the balance struck in *Wolff* between due process
and prison needs is proper.); *Rowe v. DeBruyn*, 17 F.3d 1047,
1052–53 (7th Cir. 1994) (declining to recognize a right to raise
self-defense as a complete defense in prison disciplinary pro-
ceedings); *Montgomery v. Anderson*, 262 F.3d 641, 646 (7th Cir.
2001) (rejecting application of *Miranda* to prison discipline).

This case law alone would stop us from recognizing addi-
tional procedural requirements. But another issue concerns us
as well: The procedural protections identified in *Wolff* and *Hill*
involve the determination of guilt—not the later stage when
prison officials assign sanctions. Without additional guidance
from the Supreme Court, we decline to mandate additional
safeguards in a novel context. So, the Department was not re-
quired to hear mitigation before deciding Love's sanctions.[6]

**B**

This leaves only Love's second constitutional argument,
that Executive Directive #17-09 is unconstitutionally arbitrary
on its face and as applied by the Department. Love appeals
generally to the Fourteenth Amendment's guarantees of due
process and equal protection, asserting the Constitution

---

[6] For our dissenting colleague, the amount of good time credit vacated
means *Wolff* and *Hill* do not control what procedure was due. Dissent Op.
at 33-35. But those cases precisely define the procedural protections for an
inmate, such as Love, who faces loss of good time credit in a prison disci-
plinary proceeding. *Hill*, 472 U.S. at 454; *Wolff*, 418 U.S. at 563–67. Neither
*Wolff* nor *Hill* state that those rules change depending on the magnitude
of good time credit lost. And, as the dissent acknowledges, neither case
confines itself to its facts. Given all this, *Wolff* and *Hill* establish the proce-
dural protections the Department owed Love.

forbids prison officials from making arbitrary or irrational decisions "that interfere with an inmate's constitutionally protected interests."

As support for this argument, Love looks to *Turner v. Safley*, 482 U.S. 78, 90 (1987). He quotes *Turner*, in part, for the rule that "[a] prison decision that 'infringes on inmates' constitutional rights is valid only 'if it is reasonably related to legitimate penological interests.'" We question the applicability of that case and rule. The test from *Turner* is ordinarily used to evaluate prison regulations that burden predicate constitutional rights, like the right to marry, *id.* at 96–98, or First Amendment rights, *Miller v. Downey*, 915 F.3d 460, 462–64 (7th Cir. 2019). *Turner* is thus a poor fit for this case, where Love claims the Department unlawfully interfered with his constitutionally protected liberty interest in good time credit.

Even if the rule Love offers was appropriate for prison sanction policies, his argument falls short. Love states the Directive is facially arbitrary and unconstitutional because the punishment it mandates depends on how much good time credit an inmate has. Thus, it does not match the severity of an inmate's sanction with the facts of his offense. For emphasis, Love contrasts his sanctions against those Webb received for his role in the attack on Hubbard. Love and Webb battered Hubbard, and under the Directive both men lost all their accrued good time credit. Webb had only 2,553 days of good time credit to lose, so he lost less good time credit. *See Webb v. Warden*, 19-cv-273, 2020 WL 8910953, at *1–2 (N.D. Ind. April 21, 2020).

But the Directive is not arbitrary or irrational simply because it ties punishment to available good time credit. It is perfectly rational for the Department to conclude that good

time credit—a variable benefit to prisoners—is incompatible with egregious policy violations, no matter how much or how little good time credit an inmate has accrued. The Directive will land harder on inmates with more good time credit, but that alone does not mean it is irrational.

The Directive, which mandates punishment for violent attacks, is rationally related to a collection of legitimate objectives, including deterrence, safety, and security. As the Directive itself explains, "[o]ne of the core responsibilities of the Department is to maintain the safety and security of its facilities," which would include deterrence of inmate assaults. In fact, the Directive's deterrent effect may be greatest for those inmates who have accumulated a large amount of good time credit, as they have more to lose by fighting. So, the Directive does not, as Love asserts, "make[] no effort to calibrate the severity of an inmate's sanction to the facts of his offense." The Directive applies only to certain egregious policy violations, meaning it is calibrated to offense facts and is not unconstitutionally arbitrary on its face.

Love also challenges the Department's application of Directive #17-09 as unequal and unconstitutional. He points to inmates who, despite committing violations within the Directive's coverage, presumably did not lose all their good time credit. Rodney Perry committed an A100 violation by striking and pepper-spraying a correctional officer. Directive #17-09 was in effect at the time, and Perry originally lost 4,500 days of good time credit. But the Department eventually modified his conviction to an A102 violation and lowered his sanction to 180 days of lost good time credit. *See Perry v. Zatecky*, 20-cv-02916, 2021 WL 5113985, at *1 (S.D. Ind. Nov. 2, 2021). Another inmate, Matthew Schrock, Jr., participated in the same

altercation as Love and was found guilty of two A102 violations. Schrock lost 365 days of good time credit for each offense, totaling 730 days of good time credit lost for his role in the fight. *See Schrock v. Warden*, No. 19-cv-121, 2020 WL 6455058, at *1 (N.D. Ind. Nov. 2, 2020). Love contends the Department's decision to apply the Directive in his case—but possibly not in Perry's or Schrock's—is arbitrary and unconstitutional. As best we can understand, this argument sounds in equal protection and resembles a "class of one" claim. *See FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 588 (7th Cir. 2021) (quoting *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 602 (2008)) ("The Equal Protection Clause requires a 'rational reason' for disparate treatment of those who are similarly situated."); *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988) ("Unequal treatment among inmates … is justified if it bears a rational relation to legitimate penal interest.").[7]

This attempt to show a constitutional violation also fails. Love does not substantiate his assertion that the Department "treated [him] more harshly than similarly situated … inmates" by applying the Directive in his case. A plaintiff alleging arbitrary treatment must typically present a similarly situated comparator who the State dealt with differently— someone who is "'identical or directly comparable' to [him] 'in all material respects.'" *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015) (quoting *LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010)). Love identifies

---

[7] At oral argument, we asked counsel to identify the basis of Love's arbitrariness arguments. Counsel clarified they are rooted in "the general background concept in equal protection law that you can't … treat similarly situated people differently for reasons that are wholly arbitrary or irrational." *See* Oral Arg. at 1:50–2:05.

comparators but fails to show how they are similarly situated in material respects. Love never presented this argument or any supporting evidence to the district court. So, the record does not describe the exact circumstances surrounding other inmates' policy violations or their balances of good time credit at the time of their respective offenses.

For example, Love emphasizes that the Department lowered Perry's punishment from 4,500 to 180 days. But we have no information on why the Department made that decision or why it changed his violation code from A100 to A102. Remember, the Department retains discretion to restore revoked good time credit. IND. CODE § 35-50-6-5(c). From our review of Perry's docket sheet, it appears the Department decreased Perry's good time credit loss from 4,500 days to 180 days in December 2020, after the Executive Directive's enforcement period ended. Schrock's circumstances are similarly unclear. Schrock lost 730 days of good time credit, but we do not know whether he had more than that to lose. So, it is possible that the Department applied the Directive in Schrock's case.[8]

Even if the Department applied the Directive to Love and declined to do so for similar inmates, there would still be no constitutional violation. The imposition of sanctions is an inherently discretionary act, and the use of discretion in such contexts does not raise equal protection arbitrariness concerns. *See Engquist*, 553 U.S. at 603 (explaining that there are "some forms of state action … which by their nature involve

---

[8] To the extent Love views Antwan Webb as a comparator for disparate treatment, his argument fails at the outset. The Department applied the Directive to Webb's case, so Webb and Love were treated the same. *Webb*, 2020 WL 8910953, at *2.

discretionary decisionmaking based on a vast array of subjec-
tive, individualized assessments," and different treatment of
similarly situated individuals in those situations "is an ac-
cepted consequence of the discretion granted"). Though the
Directive purported to make certain sanctions mandatory, it
did not remove the Department's discretion—in fact, the ap-
plication of the Directive itself *was* a discretionary choice.
Throughout Executive Directive #17-09's enforcement period,
the Department retained statutory discretion, notwithstand-
ing its own internal policies, to revoke and reinstate good time
credit. IND. CODE § 35-50-6-5(a)(1), (c). Any choice by the De-
partment to inconsistently apply its sanctioning policies was
within the zone of its exercise of discretion.

To be sure, prison officials are not licensed to arbitrarily
impose punishment. They must give inmates a list of rational
reasons for disciplinary action taken against them. *Wolff,* 418
U.S. at 563–64. But neither we nor the Supreme Court have
required prison officials to explain why one inmate's sanc-
tions differ from another's. What matters is why the Depart-
ment chose to sanction Love in the manner it did. *Id.* The De-
partment provided Love with a clear statement of reasons
why he lost all his good time credit, including the "[s]erious-
ness" of the offense and the "[l]ikelihood of sanction having a
corrective effect on offender's future behavior." Given those
reasons, Love's loss of good time credit is not arbitrary, even
if the Department chose not to use the Directive in other cases.

Neither the Directive nor Love's sanctions are unconstitu-
tionally arbitrary. Love has no constitutional right to the same
sanctions as similar inmates, and his appeal to equal protec-
tion fails independently.

**IV**

Love identifies no constitutional violation in his prison discipline proceedings. Given this, he cannot show prejudice to excuse procedural default. He therefore also cannot demonstrate "exceptional circumstances" or an impact on "substantial rights" to set aside his forfeiture. So, Love's constitutional arguments are procedurally defaulted and forfeited. For these reasons, we AFFIRM the district court's denial of habeas relief.

KIRSCH, *Circuit Judge*, concurring in the judgment. Tony Love advances arguments on appeal that bear no resemblance to those he made in the district court. Because Love waived his constitutional arguments by failing to raise them below, I concur only in the judgment affirming the district court's denial of Love's petition.

On appeal, Love contends that the warden violated his Fourteenth Amendment rights by: (1) failing to provide him with an opportunity to argue for a lesser sanction, and (2) imposing an arbitrary sanction. The district court heard different arguments. Love argued that his sanction was excessive and that his good time credits should be restored because the prison misapplied Executive Directive #17-09 in his case. The district court correctly concluded that Love's theory—based on an alleged error of state law—provided no basis for federal habeas corpus relief. See *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Absent from Love's district court filings was any suggestion that the prison's policy or his sanction violated the Constitution.

Love's failure to make those arguments in his habeas petition or in his briefing before the district court waived them for the purposes of appeal. See *Santiago v. Streeval*, 36 F.4th 700, 710 (7th Cir. 2022). A petitioner's decisions about what legal claims and theories to present to the district court are both intentional and strategic, so arguments that didn't make the cut below cannot find new life on appeal—they are waived. See *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court."); see also *Douglas v. Reeves*, 964 F.3d 643, 649 (7th Cir. 2020) (pro se litigants subject to the same waiver rules as

counseled litigants). Love says he adequately preserved his constitutional arguments by asserting that his sanctions were "excessive." Although we construe pro se filings liberally, see *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), there is no reasonable basis to derive the due process and equal protection arguments Love now offers from his filings below. Moreover, even if Love's assertion of excessiveness had put the court on notice of some constitutional problem in the abstract, such an underdeveloped argument would still be waived on appeal. See *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

The dissent says that calling the sanction "excessive" should have put the district court on notice of "the real due process problem here." But what the dissent sees as the real problem—that *Wolff v. McDonnell*, 418 U.S. 539 (1974), and *Superintendent v. Hill*, 472 U.S. 445 (1985), provide insufficient procedural protections when more than eighteen months of good time credit are at stake—differs from the issues Love raised in the district court. True, the district court generously interpreted Love's arguments regarding duplicative conduct reports and immaterial missing witness statements before concluding that Love had not identified a due process violation. When it came to Love's argument that his sanction was excessive under the prison's policy, however, the district court addressed the only argument before it—about the application of the policy—and concluded that state law errors could not lead to federal habeas relief. Nothing in Love's filings put the district court on notice that Love was seeking greater procedural due process protections than required by *Wolff* or *Hill* based on the severity of his sanction.

Further still, the dissent acknowledges that, despite our invitation, Love and his counsel chose not to make this

argument on appeal. *Post*, at 43 n.3. To reach the issue the dissent would like us to decide—one that no party has raised at any stage of the litigation—we would not simply be ignoring Love's waiver below. We'd also be dramatically departing from the principle of party presentation upon which our adversarial system of adjudication rests. See *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1578–79 (2020).

In sum, Love's constitutional arguments are not properly before us because he never presented them to the district court. Because Love's waiver precludes review of the merits and renders issues of procedural default moot, see *Frazier v. Varga*, 843 F.3d 258, 262 (7th Cir. 2016), I would reach neither and concur in the judgment alone.

HAMILTON, *Circuit Judge*, dissenting. Petitioner Tony Love was serving a long term in an Indiana prison when he committed a serious new crime, participating in an assault that injured two guards. Love was prosecuted for that assault in a state court. He was convicted and sentenced to an additional four and a half years in prison, consecutive to the sentence he was already serving. That prosecution and sentence, using the extensive procedural protections that apply in ordinary criminal prosecutions in civilian courts, were an entirely proper and constitutional response to Love's new crime.

The constitutional problem here arose with the additional punishment imposed on Love by prison officials, who have attempted here an unprecedented extension of Supreme Court jurisprudence on prison disciplinary procedures. A prison disciplinary board added *more than fifteen years* back onto Love's original sentence. Imposing such severe punishment through those minimal and informal procedures is, as best we can tell, literally unprecedented by a factor of ten.

Love's punishment went far beyond the limits implicit in the Supreme Court's leading decisions on due process in prison discipline, *Wolff v. McDonnell*, 418 U.S. 539 (1974), and *Superintendent v. Hill*, 472 U.S. 445 (1985). This severe punishment violated Love's right not to be further deprived of liberty without due process of law.

Also, in my view, Love has done a sufficient job of presenting his claim to allow us to reach the merits and reverse. Love was a pro se prisoner up against a State government that acted without precedent to prolong his imprisonment by more than fifteen years outside of court processes. Facing that legal peril, Love had no access to counsel and could not confront witnesses against him. He had no access to state courts

for protection of his rights. Under these circumstances, Tony Love should no more be held to strict adherence to procedural requirements for asserting his constitutional rights here than Clarence Earl Gideon, who was sentenced to (only) five years after having to defend himself without counsel in his trial. *Gideon v. Wainwright*, 372 U.S. 335 (1963).

I respectfully dissent. I begin with the due-process merits and then address the procedural obstacles that my colleagues rely upon to avoid the merits.

I.  *The Merits: The Limits of Wolff and Hill*

The merits of Love's due process claim are straightforward. The State's unprecedented attempt to expand its disciplinary powers requires a fresh and close look at the foundations of the due process jurisprudence on prison discipline. Start with Love's liberty interest. Love was serving a 55-year sentence for murder imposed under state law that allowed him to earn "one-for-one good time." One day of good behavior in prison earned one day of credit, reducing Love's sentence by one day. See Ind. Code § 35-50-6-3 (setting rules for persons convicted of committing offenses before July 1, 2014). Having been in prison for such a long time, Love had earned more than 5,700 days of good-time credit, more than fifteen years, off his original sentence.

Earned good-time credits under Indiana law create liberty interests protected by the Due Process Clause of the Fourteenth Amendment. E.g., *Cochran v. Buss*, 381 F.3d 637, 639 (7th Cir. 2004); *McPherson v. McBride*, 188 F.3d 784, 785 (7th Cir. 1999); *Meeks v. McBride*, 81 F.3d 717, 719 (7th Cir. 1996). Love could not be deprived of those credits without due process of law.

But how much process is due? The Supreme Court estab-
lished the minimum due process requirements for depriving
a prisoner of liberty interests provided by good-time credits
in *Wolff v. McDonnell* in 1974. The Court's opinion in *Wolff* is
a candid exercise in balancing competing interests: institu-
tional needs v. a prisoner's liberty interests. The balance re-
flects the three-step structure adopted soon after *Wolff* in
*Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976), weighing the
private interest at stake, the public interest at stake, and the
potential value of additional procedures.

*Wolff* recognized a prisoner's liberty interest in good-time
credits, but it also gave substantial weight to the institutional
needs of prison officials to punish misconduct much more
swiftly than could be imposed through civilian courts, and
without undue risks to institutional safety, including the
safety of witnesses. 418 U.S. at 554–63. *Wolff* held that a pris-
oner facing deprivation of good-time credits is entitled to the
following minimal procedural protections: (1) advance writ-
ten notice of the charges (but 24 hours before a hearing was
deemed sufficient); (2) a hearing before a decision-maker who
was not involved in the underlying incident; (3) an oppor-
tunity to call witnesses and present documents, but only if
consistent with institutional safety and correctional goals; and
(4) a written statement by the decision-maker of the evidence
relied upon and the reasons for the disciplinary action. *Id.* at
563–67.

At the same time, *Wolff* rejected further requirements
closer to those in criminal prosecutions. The prisoner has no
right to confront and cross-examine witnesses. The prisoner
has no right to retained counsel, let alone appointed counsel.
And the prisoner has no right to a decision-maker who is a

judge or otherwise independent of the prison administration. 418 U.S. at 567–72. The rules of evidence do not apply in prison discipline hearings. E.g., *Walker v. O'Brien*, 216 F.3d 626, 637 (7th Cir. 2000).

As for the standard of proof, the requirement of proof beyond a reasonable doubt is fundamental to due process of law in American criminal cases. E.g., *Jackson v. Virginia*, 443 U.S. 307, 315–18 (1979); *In re Winship*, 397 U.S. 358, 361–64 (1970). In *Superintendent v. Hill*, however, the Court held that a prison disciplinary decision depriving a prisoner of liberty needs to be supported only by "some evidence." 472 U.S. at 454. This standard may be the least demanding in American law for any purposes, let alone for depriving a person of his liberty.

The results of these minimal procedural and substantive demands are evident in our court's jurisprudence, particularly in the numerous cases brought by Indiana prisoners directly to federal court. (Indiana has chosen not to provide state-court judicial review of nearly all prison disciplinary decisions. *McAtee v. Cowan*, 250 F.3d 506, 508 (7th Cir. 2001); *Walker*, 216 F.3d at 637–38.)

Under *Wolff* and *Hill*, for example, a prisoner may lose good-time credits if a prison official decides to believe a second-hand tip from another prisoner. The loss of liberty may be imposed without the accused knowing the identity of his accuser, let alone having any opportunity to confront or question the accuser or any other adverse witness, and perhaps without the opportunity to call any witnesses or offer any documentary evidence of his own. The accused, for example, may be denied access to video evidence of an incident on the theory that disclosure of the recording would disclose confidential information about the capabilities of the

monitoring system. See, e.g., *Crawford v. Littlejohn*, 963 F.3d 681, 682–83 (7th Cir. 2020) (reversing grant of habeas corpus; uncorroborated hearsay may provide "some evidence"); *Scruggs v. Jordan*, 485 F.3d 934, 940–41 (7th Cir. 2007) (no right to call live witnesses or view surveillance video); *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003) ("prison disciplinary committees may deny witness requests that threaten institutional goals or are irrelevant, repetitive, or unnecessary"); *Gaither v. Anderson*, 236 F.3d 817, 820 (7th Cir. 2001) (affirming denial of access to video evidence for security reasons), overruled in part on other grounds, *White v. Indiana Parole Bd.*, 266 F.3d 759, 765–66 (7th Cir. 2001).

Making matters more challenging, whatever defense the accused prisoner hopes to offer might have to be assembled in as little as 24 hours, and without any help from a lawyer. See *Westefer v. Neal*, 682 F.3d 679, 684–86 (7th Cir. 2012) (vacating injunction requiring more than 24 hours' notice); *Jackson v. Carlson*, 707 F.2d 943, 948–49 (7th Cir. 1983) (rejecting claim of "[in]adequate staff representation" because "[n]o court has recognized any sort of right to counsel in prison discipline cases").

To be clear, my point is not to disagree with or criticize *Wolff* or *Hill*. They have been settled law for decades. My points are instead (a) to emphasize how different these rules are from an ordinary criminal prosecution and (b) to prevent their unprecedented extension to impose punishments far more severe than the Court considered in *Wolff* and *Hill*. A closer look at the due process analysis in those cases shows that neither *Wolff* nor *Hill* offers any support for the result in this case: use of the minimal procedures they accepted to deprive a person of liberty for more than fifteen years. In *Wolff*,

the state's disciplinary sanctions could extend a sentence by no more than a year and a half. 418 U.S. at 585 (Marshall, J., concurring in part and dissenting in part). In *Hill*, the most severe punishment at issue was 100 days of good time. 472 U.S. at 448.

Petitioner Love's loss of liberty in this case is more than ten times greater than the maximum loss considered in *Wolff* and more than fifty times greater than the maximum loss in *Hill*. These order-of-magnitude differences change the due process balance, and do so dramatically. In terms of *Wolff* and *Mathews v. Eldridge*, the private interest at stake here dwarfs the private interests at stake in *Wolff* and *Hill*.

Such a dramatic difference should change the balance to require much more robust procedural and substantive protections, like the full set of rights that applied to Love when he was prosecuted for the same assault in a civilian court. Those additional procedural protections are intended to reduce the risk of errors that the Supreme Court deemed tolerable in *Wolff* and *Hill*, where the stakes were so much lower, without indicating that errors with much more serious consequences would be tolerable.

To be sure, the Supreme Court's opinions in *Wolff* and *Hill* did not identify any cap on the punishment that could be imposed through the minimal procedures they approved. But neither did they expressly authorize sanctions more severe than those suffered by the prisoners before them. Our court's job is to understand the Court's reasoning in those cases, including limits that were implicit in that reasoning. The Court's decisions expressly balanced private interests against public interests. See *Hill*, 472 U.S. at 454 ("requirements of due process are flexible and depend on a balancing of interests

affected by the relevant government action"); *Wolff*, 418 U.S. at 560–63 (identifying public and private interests to be balanced). A ten- to fifty-fold increase in the private interest at stake calls for a different outcome.[1]

As best I can tell, no other State has tried to use the minimal procedures of prison discipline to impose punishments remotely close to the fifteen-plus years of prison Indiana has imposed on petitioner Love. Nor has any court approved of such severe punishment imposed through these minimal procedures. Because the due process balance weighs so heavily in favor of petitioner, we should enforce the Due Process Clause here by granting a writ of habeas corpus setting aside the punishment imposed on petitioner through these minimal processes.[2]

---

[1] The Court's 1974 opinion in *Wolff* included the unusual comment that its holdings were not "graven in stone." 418 U.S. at 572. Emphasizing the balancing test, the Court said its procedural requirements "represent a reasonable accommodation between the interests of the inmates and the needs of the institution," *id*., but explained further: "As the nature of the prison disciplinary process changes in future years, circumstances may then exist which will require further consideration and reflection of this Court." *Id*. The radical change in the balance of interests in this case calls for a new look at the applicable rules and the limits of *Wolff* and *Hill*.

[2] According to our research, the most significant deprivations of good-time or earned credit considered by the circuits generally do not exceed two years. E.g., *Wall v. Kiser*, 21 F.4th 266, 268–69 (4th Cir. 2021) (270 days: declining to apply retroactively procedural right to access surveillance evidence in prison disciplinary proceedings); *Lerma v. Estelle*, 585 F.2d 1297, 1297–99 (5th Cir. 1978) (360 days: petition denied for failure to exhaust administrative remedies); *Hensley v. Wilson*, 850 F.2d 269, 272, 276, 283 (6th Cir. 1988) (two years: holding that prison disciplinary committees must assess confidential informant reliability and produce contemporaneous, non-public, written records to allow judicial review but granting

One theoretical solution for the due process problem here would be to adopt some sort of sliding scale for prison discipline procedures, adding procedural protections to the *Wolff/Hill* floor as the potential punishment increases. I suspect that answer would be quite difficult to apply and even more difficult to work out through case law. That answer would also run contrary to the Supreme Court's instructions to lower courts since *Wolff* and *Hill* not to add procedures to the ones adopted in those decisions where they apply. See *Crawford*, 963 F.3d at 683, citing *Baxter v. Palmigiano*, 425 U.S. 308, 321–22 (1976).

The better solution, pending further guidance from the Supreme Court, would be to stick with the maximum eighteen-month punishment accepted in *Wolff*. Such swift punishment

---

defendants qualified immunity); *Offet v. Solem*, 823 F.2d 1256, 1257, 1261 (8th Cir. 1987) (270 days: ordering stay of prisoner's action under 42 U.S.C. § 1983 until state remedies exhausted); *Clardy v. Levi*, 545 F.2d 1241, 1243, 1246 (9th Cir. 1976) (212 days: dismissing appeal under Administrative Procedure Act for want of jurisdiction); *Magar v. Parker*, 490 F.3d 816, 817 (10th Cir. 2007) (one year: petition procedurally barred). Most cases involve much less. Only a few have ever dealt with deprivations exceeding two years. See *Hudson v. Johnson*, 242 F.3d 534, 535–37 (5th Cir. 2001) (3,530 days: assuming protected liberty interest and holding that deprivation was supported by "some evidence"); *Arsberry v. Sielaff*, 586 F.2d 37, 42–44 (7th Cir. 1978) (three to five years: five prisoners, who conceded that deprivations of good-time credits comported with *Wolff*, challenged segregation and loss of opportunity to earn good-time credit). The petitioners in *Hudson* and *Arsberry* did not challenge the deprivations as excessive or challenge the procedures used in the prison disciplinary process. Also, in neither case did the court address the question in this case: whether the State may, consistent with the Due Process Clause of the Fourteenth Amendment, deprive a prisoner of so much earned time by using the minimum procedures accepted in *Wolff* and *Hill*.

allows prison officials to protect their institutional interests consistent with *Wolff* and *Hill* while leaving more severe punishments for prosecution and conviction in a civilian court using the full procedural protections in criminal prosecutions.

## II. *Procedural Issues*

My colleagues focus on procedural issues. Judge Brennan's opinion finds procedural default in the prison administrative hearing and forfeiture in the district court. Judge Kirsch's opinion finds waiver in the district court by this pro se prisoner facing a State government exploring untested constitutional territory. On those procedural points, I respectfully disagree.

### A. *Procedural Default in the Prison*

Petitioner Love seeks relief under 28 U.S.C. § 2254. Prison discipline cases filed by Indiana prisoners present special issues of exhaustion of state remedies and procedural default because Indiana offers prisoners no path for judicial review of revocations of good-time credits, with only narrow exceptions. *Lauderdale-El v. Indiana Parole Bd.*, 35 F.4th 572, 580–81 (7th Cir. 2022). Section 2254(b)(1) provides that a State prisoner's petition for a writ of habeas corpus

> shall not be granted unless it appears that—
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

As applied to prison disciplinary cases from Indiana, which Indiana courts almost never see, Section 2254 has posed challenges for this court. For example, we have held that a prison disciplinary board is *not* a "State court" whose decision is entitled to deferential review under Section 2254(d). *White v. Indiana Parole Bd.*, 266 F.3d 759, 765–66 (7th Cir. 2001). On the other hand, we have held that the exhaustion requirement of Section 2254(b) phrased in terms of "the courts of the State" *does* apply to prison disciplinary boards. *Markham v. Clark*, 978 F.2d 993, 994–96 (7th Cir. 1992) (applying statutory language carried forward under AEDPA).

Judge Brennan's opinion finds that Love procedurally defaulted his due process challenge by failing to raise it before the prison disciplinary board. Relying on *Moffat v. Broyles*, 288 F.3d 978, 982 (7th Cir. 2002), which followed *Markham*, the opinion applies exhaustion and procedural default rules as if the prison board were a court and finds that a prisoner procedurally defaults unless he fairly "present[s] legal contentions" through each level of the prison's disciplinary process.

This case does not present an occasion to question broadly the fit between the statutory language and federalism policies behind Section 2254(b), particularly the statutory references to "the courts of the State," and the extension of that language to prison disciplinary boards in *Markham* and *Moffat*. Even assuming that the extension was proper, we should not find procedural default or a failure to exhaust here for reasons specific to this case.

First, and most narrowly, the State did not confront Love with Executive Directive #17-09 during the prison disciplinary process. Love thought he was facing a loss of no more than one year of good-time credit. Not until much later, when

the State responded in the federal district court to his habeas petition, did the State invoke Executive Directive #17-09 to justify the more than fifteen-year loss of good time in this case. Dkt. 15 at 2. During the prison disciplinary process, Love simply had no reason to make the due process arguments addressed above.

Second, even if the State had put Love on notice earlier that he was facing a loss of more than fifteen years of good-time credit under the Executive Directive, there would have been no point in making a constitutional due process argument before the disciplinary board. The board could not have granted him relief from the Executive Directive by the Indiana Commissioner of Correction, the head of the entire Department of Correction. The prison disciplinary board simply did not have the authority to overrule the Commissioner's policy, let alone the familiarity with federal constitutional law to adjudicate the merits of the issue here.

Ample authority excuses failures to exhaust constitutional issues before agencies that have no expertise or authority to decide them. See generally, e.g., *Carr v. Saul*, 141 S. Ct. 1352, 1360–61 (2021) (declining to require issue exhaustion of structural constitutional challenge outside agency's expertise and power to grant relief); *Mathews v. Eldridge*, 424 U.S. 319, 329–30 (1976) (excusing failure to raise before agency plaintiff's constitutional challenge to administrative procedures); *Indiana Dep't of Envt'l Mgmt. v. Twin Eagle LLC*, 798 N.E.2d 839, 844 (Ind. 2003) (exhaustion of administrative remedies not required for pure issues of law); *Sunshine Promotions, Inc. v. Ridlen*, 483 N.E.2d 761, 765 (Ind. App. 1985) (executive official lacked authority to pass on constitutionality of state statute). These authorities addressed parties represented by counsel

and risking much less than the stakes for Love in the disciplinary proceeding. Their logic applies with even more force to an uncounseled prisoner facing a loss of liberty. Accordingly, we should not require Love to have raised the basic due process problem with the Executive Directive during the prison disciplinary process.

If these two reasons were not enough to allow us to reach the merits, there is more. Judge Brennan's opinion acknowledges that a prisoner is not required to "articulate legal arguments with the precision of a lawyer." Ante at 8, quoting *Moffat*, 288 F.3d at 982 ("If Moffat had expressed disgruntlement about the generic reason [given for imposing discipline], that would have been sufficient whether or not he cited *Wolff*. …"). So even if Love might have been required to present his constitutional issue to the prison disciplinary board that could do nothing about it, he made clear all along that he was challenging his punishment as excessive. Love's assertion in the disciplinary process that the deprivation went beyond what the Disciplinary Code allowed was more than enough to alert the disciplinary authorities that Love saw a problem with how the sanctions had been calculated. See *id.* That should have been enough, especially when he was confronting without counsel a State's unprecedented effort to deprive him of liberty for more than fifteen years by stretching Supreme Court decisions beyond recognition.

Still further, the reasons for issue exhaustion in habeas cases do not apply in this case. Exhaustion "is designed to give the State *courts* a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) (emphasis added). The need for that full and fair

opportunity flows from "considerations of comity, the necessity of respect for coordinate judicial systems," for "state *courts* share with federal courts an equivalent responsibility for the enforcement of federal rights." *Schlesinger v. Councilman*, 420 U.S. 738, 755–56 (1975) (emphasis added); see also *Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022) ("Together, exhaustion and procedural default promote federal-state comity."). In other words, the procedural requirements assume the *judicial* nature of state review. See *Magwood v. Patterson*, 561 U.S. 320, 340 (2010) ("If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention—whether in trial, appellate, or habeas proceedings, as state law may require—procedural default will bar federal review."). Comity and federalism concerns do not have the same force where the State has elected to forgo state-court review of decisions made by prison authorities.

B. *Forfeiture or Waiver in the District Court?*

Judge Brennan's opinion also finds that Love forfeited his due process claim because he never raised in the district court "an argument resembling those he now offers." Ante at 13. Judge Kirsch's opinion finds waiver. In this unusual case, we should overlook this pro se prisoner's limited ability to respond to the State's unprecedented effort to punish him so severely using the minimal procedures of prison discipline.

We "liberally construe prisoner complaints," like Love's habeas petition, "filed without the assistance of a lawyer." *Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022). The narrowest reason to do so is very case-specific. In his habeas petition, Love called the loss of all his good-time credit "excessive." Dkt. 1 at 4. Of course, Love believed the deprivation was "excessive" when measured against the Disciplinary Code's one-

year limit. When he filed his petition, his arguments responded to what prison officials had told him. He did not even know that Executive Directive #17-09 had been applied to his case. Liberally construed, calling the deprivation "excessive" should be enough to signal the real due process problem here. In a later memorandum in the district court, Love explicitly framed his claim as "a due process violation" and cited Seventh Circuit cases—*Richards v. Buss*, 190 F. App'x 491 (7th Cir. 2006), and *Piggie v. McBride*, 277 F.3d 922 (7th Cir. 2002)—dealing with the deprivation of good-time credits without sufficient due process protections. Dkt. 15 at 3. This was not lost on the district court, which specifically addressed "whether the disciplinary proceeding … or the sanctions assessed as a result of it … deprived Mr. Love of his due process rights guaranteed by *Wolff* and *Hill*." Dkt. 20 at 6. The district court liberally construed Love's arguments, and we should too.

Love's pro se submissions admittedly did not raise the specific due-process theory explained above. I respect the general principle of party presentation, but that principle "is supple, not ironclad." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). This is a case where it should bend. It is not reasonable to expect a pro se prisoner to develop such a theory in response to a State's unprecedented attempt to extend Supreme Court precedents to deprive him of so much liberty with such minimal procedures. This is the kind of rare case where we should exercise our discretion to reach the merits, as we recently did for no less capable a litigant than the United States Department of Justice. See, e.g., *Bourgeois v. Watson*, 977 F.3d 620, 631–32 (7th Cir. 2020) (excusing forfeiture in district court and upholding death penalty in federal prosecution). The unprecedented severity of Love's

punishment led us to recruit counsel for Love to brief the im-
plications for due process where a prisoner is deprived of so
much good-time credit. It would not be reasonable to expect
Love to have developed himself the view I have expressed on
the merits.[3]

In sum, the unprecedented use of the minimal procedures
of *Wolff* and *Hill* to deprive Love of more than fifteen years of
liberty calls for an exercise of our discretion to reach the mer-
its and to reverse the denial of the writ. I respectfully dissent.

---

[3] This panel reviewed Love's pro se briefing on appeal. We decided to
recruit counsel for him and ordered further briefing to address "whether
the State may, consistent with the due process clause of the Fourteenth
Amendment, deprive petition of so much earned time by using the due
process requirements" of *Wolff* and *Hill*. This court and the parties before
us often benefit from generous and able pro bono work from many mem-
bers of the bar. In this case, however, recruited counsel apparently chose
not to address the issue as we tried to frame it and as I have addressed it
above. They instead argued only (a) that due process required that the de-
cision-maker have flexibility in deciding the severity of Love's punish-
ment, and (b) that Love's punishment violated his due process and equal
protection rights because it was so much more severe than that imposed
on others involved in the same offense. The brief was well written, but
with respect, even in criminal courts mandatory minimum sentences do
not violate due process of law (apart from death sentences or, for juvenile
offenders, life without parole, addressed under both the Eighth and Four-
teenth Amendments). The equal protection theory briefed by counsel vir-
tually never finds any traction when co-defendants receive different indi-
vidual sentences.